**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

HENRY KAUFMAN,                          )
                                        )
              Plaintiff,                )
                                        )
vs.                                     )
                                        )          Case No. 4:09-CV-318-GKF-TLW
HSBC USA, INC., WTAS LLC, and JOE       )
DEGIROLAMO, individually,               )
                                        )
              Defendants.               )

## OPINION & ORDER

This dispute involves two individuals and two businesses, all of whom provided services to Maurice Kanbar, a wealthy California businessman.  Henry Kaufman brought this action against HSBC USA, Inc., a holding company,  ("HSBC USA"), WTAS LLC, a tax valuation and consulting firm ("WTAS"), and Joe DeGirolamo, the managing director of WTAS's San Francisco, California office (collectively "Defendants").   Mr. Kaufman alleges that  the Defendants conspired against him, fraudulently and negligently made misrepresentations to him and withheld information from him, and caused defamatory statements to be published about him, thereby interfering with his business relationships and causing him emotional distress.  The Defendants have filed individual motions to dismiss this case for lack of personal jurisdiction.

**Dkts. 29, 32, 33.**  For the reasons set forth in this opinion, the Defendants' motions are granted.

### I.  Summary of the Facts[1]

Henry Kaufman worked as an inter-dealer stock broker in New York City until his retirement in 1990.  Dkt.2 Ex. B ¶¶ 8, 9.  In 2001, he moved to California at the invitation of his

---

[1]  This section provides a brief overview of the dispute, and additional facts will be discussed when necessary to the jurisdictional analysis.

longtime friend, Maurice Kanbar, and he later agreed to help Mr. Kanbar manage his investments. *Id.* ¶¶ 14-19.[2] As Mr. Kanbar's financial advisor, Mr. Kaufman interacted with a number of individuals and entities who provided professional services to Mr. Kanbar, including: Rachel Warren, Mr. Kanbar's attorney; WTAS, a tax valuation and consulting firm that has provided tax services to Mr. Kanbar since 2002; Joe DeGirolamo, the director of WTAS's San Francisco office and the WTAS employee in charge of the Kanbar account; and HSBC, a bank that structured and sold investments to Mr. Kanbar and entities associated with him ("HSBC Bank").

In 2005, Mr. Kaufman moved to Tulsa, Oklahoma to act as Mr. Kanbar's agent in the acquisition and management of a number of properties valued at more than $108 million ("the Tulsa Properties"). Dkt.93 Ex. 6 ¶ 3. While in Tulsa, Mr. Kaufman remained in contact with WTAS, Mr. DeGirolamo and representatives of HSBC Bank.[3] Mr. Kaufman and other Tulsa professionals frequently discussed matters pertinent to the purchase of the Tulsa Properties with WTAS, Mr. DeGirolamo, and HSBC Bank, including, among other things, the possibility of redeeming two Net Income Charitable Remainder Trusts ("the NIMCRUTs")[4] in order to free up capital for the purchase of the Tulsa Properties.

The specific facts that give rise to this action occurred in late 2005 and early 2006, when the Defendants allegedly conspired to defame and discredit Mr. Kaufman by misleading him

---

[2] Mr. Kaufman did not enter into a formal agreement with Mr. Kanbar, nor was he compensated for his services.

[3] *See* Dkt.93 Ex. 6 ¶ 32-33 (asserting that Mr. Kaufman communicated with HSBC Bank representatives for the purpose of managing Mr. Kanbar's various investments).

[4] Mr. DeGirolamo and Mr. Kaufman established the NIMCRUTs in 2002 while Mr. Kaufman was living in California.

about the applicability of Internal Revenue Service ("IRS") self-dealing regulations, causing him to violate those regulations, and blaming him for the resulting violation.  Dkt.2 Ex. C ¶¶ 17-23, 36-37; *see* Dkt.93 Ex. 6 ¶¶ 27-29, 37.  Specifically, Mr. Kaufman alleges that HSBC Bank informed him that collateral held in Kanbar Spirits, Inc. ("KSI") accounts was no longer acceptable.  Dkt.2 Ex. B ¶ 54.  HSBC indicated that it would accept replacement collateral in the form of a note worth $2 million.  Mr. Kaufman accepted this suggestion and substituted the collateral.  Sometime later, Mr. DeGirolamo contacted Mr. Kaufman and told him that the substitutions may have violated IRS self-dealing regulations.  Mr. DeGirolamo also informed Mr. Kanbar of the situation and blamed Mr. Kaufman for the violation.  The Defendants, acting in concert to place the blame squarely on Mr. Kaufman, *see* Dkt.93 Ex. 6 ¶ 37, Dkt.93 Ex. 11, caused Mr. Kaufman to accept responsibility for the violation.  As a result, Mr. Kaufman was forced to resign as Mr. Kanbar's financial advisor.  In addition, Mr. Kanbar "published numerous allegations in Oklahoma concerning . . . [Mr. Kaufman's] self-dealing and mismanagement," Dkt.93 Ex. 6 ¶ 39, and testified that Mr. Kaufman lied to him and deceived him, *id.* at 29.[5]  Mr. Kaufman claims that the Defendants' fraudulent scheme–and the defamatory statements that were caused by that scheme–caused him injury in the state of Oklahoma.

---

[5]  Mr. Kaufman also alleges that "a defamatory statement was published in which it was stated that Kaufman was an incompetent advisor."  Dkt.2 Ex. C ¶ 7.  No details are provided about the location of this publication; this allegation may be a reference to Mr. Kanbar's testimony that Mr. Kaufman "lied [to him] and deceived him."  Dkt.93 Ex. 6 ¶ 29.

## II.  Analysis

The Defendants ask this court to dismiss Mr. Kaufman's complaint, arguing that this court lacks personal jurisdiction over them.  Mr. Kaufman bears the burden of establishing that this court has jurisdiction over the Defendants.  *Rambo v. S. Am. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988) (quoting *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir.1984)).[6]  To do so, Mr. Kaufman must "show both that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process." *Intercon, Inc. v. Bell Atl. Internet Sol'ns, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (citing *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995)).  Because Oklahoma's long-arm statute permits courts to exercise jurisdiction to the full extent permitted by the United States Constitution, the first element collapses into the second, and jurisdiction may be exercised over the nonresident defendant so long as the exercise of jurisdiction comports with due process. *See id.*; *see also* Okla. Stat. tit. 12 § 2004(F).

"The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant 'so long as there exist minimum contacts between the defendant and the forum State.'"

---

[6]  Because the Defendants' motions are being resolved on the basis of the materials presently before this court and without the benefit of an evidentiary hearing, Mr. Kaufman "need only make a prima facie showing of personal jurisdiction" to defeat the Defendants' motions. *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).  Mr. Kaufman "may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the [Defendants]." *Id.*  This court will "accept as true the allegations set forth in [Mr. Kaufman's] complaint to the extent they are uncontroverted by [the Defendants'] affidavits." *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1524 (10th Cir. 1987) (citing *Behagen v. Amateur Basketball Ass'n of the U.S.A.*, 744 F.2d 731, 733 (10th Cir.1984)).  In the event that the parties' affidavits conflict, this court must resolve any conflict in Mr. Kaufman's favor.  *See Behagen*, 744 F.2d at 733.

*Intercon, Inc.*, 205 F.3d at 1247 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)).  A plaintiff may demonstrate that a nonresident defendant has established minimum contacts with a state in one of two ways: First, the plaintiff may show that the defendant is subject to specific jurisdiction because he "has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations and quotation marks omitted); *see also OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1090-91 (10th Cir. 1998).  Alternatively, in controversies that do not arise out of the defendant's forum-related activities, the plaintiff may show that the defendant is subject to *general* personal jurisdiction "based on the defendant's general business contacts with the forum state." *OMI Holdings, Inc.*, 149 F.3d at 1091 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)).

The Defendants assert that Mr. Kaufman cannot prevail under either of these two methods of establishing personal jurisdiction.  HSBC USA maintains that it has no ties with the state of Oklahoma; it further claims that it was not party to the events that preceded and gave rise to this action.  In contrast, WTAS and Mr. DeGirolamo acknowledge that they were party to certain activities and transactions referenced in Mr. Kaufman's complaint; nevertheless, they argue that they are not subject to personal jurisdiction in Oklahoma because (1) this dispute did not arise out of their contacts with the state, and (2) they did not establish general business ties with the state of Oklahoma.  Due to the differences in the Defendants' arguments, this court will first address whether HSBC USA is subject to jurisdiction in Oklahoma before turning to the arguments raised by WTAS and Mr. DeGirolamo.

**A.      Whether HSBC USA is Subject to Personal Jurisdiction in Oklahoma**

HSBC USA asserts that Mr. Kaufman has named the wrong corporate entity as a defendant in this case.  It notes that, according to Mr. Kaufman's complaint and other materials before this court, Mr. Kaufman seeks to redress injuries caused by a banking institution that deals in investments and mortgages.  HSBC USA, however, has presented evidence that it is not a bank, but a holding company whose business consists solely of holding stock.  *See* Dkt.29 Ex. A ¶ 8 (Affidavit of HSBC USA Senior Vice President Michael Forde).  The evidence presented by HSBC USA tends to show that the named HSBC defendant has no ties or connections with the state of Oklahoma, and was not involved in the transactions giving rise to this lawsuit.[7]

Mr. Kaufman does very little to refute HSBC USA's claim that the wrong defendant was named in this case.  He simply notes that the initials "HSBC" are used in the names of numerous companies, asserts that "under the current status the proper party appears to be that which has been designated in the caption," Dkt.93 at 9, and argues that HSBC USA is subject to jurisdiction due to (1) its role in the acquisition of the Tulsa Properties,[8] (2) its communications

---

[7]    The affidavit of HSBC USA Senior Vice President Michael Forde indicates that HSBC USA is a Maryland corporation whose principal place of business is New York, New York; it is not a resident of Oklahoma, and it has no agents, property, business records, employees, bank accounts, phone listings or offices in Oklahoma.  Dkt.29 Ex. A ¶¶ 1-5.  The affidavit further provides that the company does not conduct business within Oklahoma, has not provided or sold products or services in Oklahoma, has not purposely done any act or engaged in any transaction within the state of Oklahoma, has held no meetings in the state and has no officers or directors that reside in or are domiciled in the state.  *Id.* ¶¶ 6-7, 9-11.

[8]    Mr. Kaufman alleges that HSBC provided refinancing in Oklahoma for the sale and operation of the Tulsa Properties. Dkt.93 at 9; Dkt.93 Ex. 6 ¶ 31; Dkt.93 Ex. 4 (mortgage agreement between an Oklahoma LLC and HSBC Realty Credit Corporation). In doing so, it sent loan officers and appraisers to Tulsa in order to negotiate mortgages and sent agents to meetings pertaining to the Tulsa Properties.  Dkt.93 Ex. 6 ¶ 31.

with Oklahoma professionals,[9] (3) its physical presence in and its general contacts with the state

of Oklahoma,[10] and (4) its website, which is accessible to Oklahoma residents.[11]

As HSBC USA correctly points out, Mr. Kaufman has presented no evidence that

contradicts HSBC USA's claim that it is merely a holding company.  Although Mr. Kaufman has

pointed to a number of contacts between *some* HSBC entity and the state of Oklahoma, he has

done nothing to show that the contacts on which he relies are attributable to the *particular*

*defendant* named in this case.  Indeed, upon close inspection, it appears that many of the

materials presented by Mr. Kaufman are attributable to entities other than HSBC USA.  *See*

Dkt.93 Ex. 1 (email from Katrine McClanahan, whose signature is associated with HSBC Private

---

[9]  Mr. Kaufman claims that he would discuss Mr. Kanbar's investments with HSBC Bank representatives on a daily basis.  Dkt.93 Ex. 6 ¶ 33.  Some of these communications were related to redemption of the NIMCRUTs, *see id.*, while others pertained to HSBC Bank's assertion that Kaufman needed to replace the collateral in certain KSI accounts, *id.* ¶¶ 34, 35. *See* Dkt.93 Ex. 1 (email from HSBC to Kaufman discussing replacement collateral); Dkt.93 Ex. 8 (emails to Mr. Kaufman from a representative of HSBC Private Bank pertaining to HSBC's request that Mr. Kaufman sign and fax a letter to "shore up" the David Kanbar collateral position).

[10]  Mr. Kaufman alleges that HSBC has a physical presence in Oklahoma.  In support of this assertion, he points to a map produced on an internet search engine using the search phrase "HSBC Oklahoma."  Dkt.93 Ex. 5 at 1.  The map indicates that there is an entity called "HSBC Card Services, Inc." in Tulsa, Oklahoma.  In addition, Mr. Kaufman points out that, according to the website www.manta.com/company/mtr83ln, there is an HSBC Bank branch in Edmond, Oklahoma. *Id.* at 4.  He also claims that HSBC runs HSBC North America News, a news service for banking professionals that provides news and information on Oklahoma banks.  *Id.* at 3.

[11]  According to the website produced by Mr. Kaufman, HSBC Bank is an international banking and financial services organization headquartered in London.  *See* Dkt.93 Ex. 10 at 3.  Shares in HSBC Holdings, PLC are held by shareholders in more than 119 countries, and are traded on the New York Stock Exchange.  The website indicates that HSBC Bank provides a range of services, including commercial, private and investment banking and personal finance services.  Under the "Private Banking" tab, the website provides information about banking and wealth management for individuals and families, and it directs individuals to contact their local offices in order open an account.  *Id.* at 4-5.

Bank); Dkt.93 Ex. 4 (mortgage listing HSBC Realty Credit Corporation as mortgagee); Dkt.93

Ex. 5 (search engine result, listing location of HSBC Card Services, Inc.); Dkt. 93 Ex. 8 (email

from Katrine McClanahan, whose email address ends in "@hsbcpb"); Dkt.93 Ex. 10 (company

website, discussing shares in HSBC Holdings, PLC).  Mr. Kaufman even admits, in his own

affidavit, that the individuals with whom he spoke during the events that gave rise to this suit

were representatives of "HSBC Private Bank." Dkt.93 Ex. 6 ¶ 33.

Mr. Kaufman has presented no evidence that the specific defendant named in this lawsuit

has sufficient contacts with the state of Oklahoma to allow this court to exercise jurisdiction over

it; instead, he continues to rely on the evidence he submitted that pertains to *HSBC Bank's*

activities in Oklahoma.  But this evidence is not pertinent to the question of whether *HSBC USA*

is subject to jurisdiction in this state.  Absent a showing that the actions of these other HSBC

entities are somehow attributable to HSBC USA, this court cannot assume jurisdiction over the

named defendant.  *See Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216 (10th Cir. 2002)

(concluding that the district court lacked jurisdiction over the defendant holding company, even

though the defendant had sold a prescription drug to its American subsidiary prior to the events

giving rise to the cause of action);  *OMI Holdings, Inc.*, 149 F.3d at 1093 (stating that the acts of

third parties "are not relevant to measuring a defendant's minimum contacts with a forum

state"); *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 458-59 (10th Cir. 1996)

(concluding that an independent distributor's acts could not be attributed to the defendant for the

purpose of establishing general jurisdiction absent a showing that an agency relationship existed

between the defendant and the distributor).  Accordingly, HSBC USA's motion must be granted.

Mr. Kaufman may, in accordance with the procedures set forth in Fed. R. Civ. P. 15,  seek to

substitute another HSBC entity for HSBC USA within fourteen (14) days of the entry of this order. *See United States ex rel Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1166 (10th Cir. 2009) (noting that motions to substitute parties are treated as motions to amend). This court takes no view as to the merits of such a motion.

**B.      Whether this Court may Exercise Personal Jurisdiction over WTAS and Mr. DeGirolamo**

1.      General Jurisdiction over WTAS

"'[B]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts'" with the forum state. *OMI Holdings, Inc.*, 149 F.3d at 109 (citation and quotation marks omitted). When evaluating whether a defendant has established general contacts with a particular forum, courts have considered, among other things, the following twelve factors: (1) Whether the defendant conducts business in the state; (2) whether the defendant is licensed to conduct business in the state; (3) whether the defendant owns, leases, or controls property or assets in the state; (4) whether the defendant maintains employees, offices, agents, or bank accounts in the state; (5) whether the defendant's shareholders reside in the state; (6) whether the defendant maintains phone or fax listings in the state; (7) whether the defendant advertises or otherwise solicits business in the state; (8) whether the defendant travels to the state by way of salespersons or other representatives; (9) whether the defendant pays taxes in the state; (10) whether the defendant visits potential customers in the state; (11) whether the defendant recruits employees in the state; and (12) whether the defendant generates a substantial portion of its national sales or

income through revenue generated from in-state customers. *Soma Med. Int'l. v. Standard Chartered Bank*, 196 F.3d 1292, 1295-96 (10th Cir. 1999) (quoting *Buddensick v. Stateline Hotel, Inc.*, 972 P.2d 928, 930-31 (Utah Ct. App. 1998)); *see also Smith v. Basin Park Hotel, Inc.*, 178 F. Supp. 2d 1225, 1231 (N.D. Okla. 2001).

WTAS has established few of these enumerated contacts.  WTAS is organized under the laws of Delaware, and its principal place of business is in New York.[12]  Neither WTAS nor its predecessor corporation[13] has had an office in the state of Oklahoma.  Dkt.33 Ex. 1 ¶¶ 2, 11.  WTAS has neither advertised in Oklahoma nor solicited business from any entities or individuals in that state.  *Id.* ¶¶ 7-8.  WTAS has never maintained any property, agents, assets, employees, representatives, bank accounts, phone listings or mailing addresses in the state of Oklahoma.  *Id.* ¶¶ 11, 12.  It has never been licensed to do business in Oklahoma and has never paid Oklahoma taxes or recruited employees in the state.  *Id.* ¶ 12.  WTAS has sent representatives to Oklahoma on only three occasions, Dkt.94 Ex. 5 at 4, and, with the exception of one client who relocated to the state, WTAS has no record of doing business with any vendor, client or other party in the state of Oklahoma, Dkt.33 Ex. 1 ¶ 10.

With the exception of three visits to an Oklahoma client, WTAS has not engaged in any of the aforementioned activities in the state of Oklahoma.  Nevertheless, Mr. Kaufman argues

---

[12]   WTAS LLC's sole member is WTAS Holdings LLC.  WTAS Holdings has two members that are also LLCs.  None of the members of those LLCs are Oklahoma citizens.  Dkt.33 Ex. 1 ¶ 3.

[13]   Until December 31, 2007, WTAS–then operating under the name "Wealth and Tax Advisory Services, Inc.–was a wholly owned subsidiary of HSBC USA, Inc.  It was organized under Delaware law and its principal place of business was located in New York.  *Id.*  ¶ 1.  At the end of 2007, the corporation was converted to a limited liability company, renamed WTAS LLC, and sold to WTAS Holdings  LLC.  *Id.* ¶ 2.

that WTAS should be subject to general jurisdiction in Oklahoma because it has had numerous phone and email conversations with individuals in the state.  For example, WTAS made phone calls into the state while providing services to the relocated Oklahoma client.[14]  Also, WTAS has contacted Oklahoma residents in order to gather information for tax returns,[15] and WTAS may have electronically filed tax returns with the state on behalf of its clients.[16]  Furthermore, WTAS frequently communicated with individuals in Oklahoma during the course of its representation of Maurice Kanbar.[17]  According to Mr. Kaufman's affidavit,[18] WTAS, through Mr. DeGirolamo,[19]

---

[14]  WTAS began providing services to the relocated client in late 2004.  Dkt.33 ¶ 4.  Although the client began the process of relocating its headquarters to Oklahoma that same year, "WTAS did not solicit the relocated Oklahoma client in Oklahoma."  *Id.* ¶ 5.  Instead, WTAS's relationship with the client "commenced in South Florida," where the client's tax department remained until late 2005.  *Id.* ¶¶ 4-5.  The relationship between the entities continued for some time after the tax department had moved to Tulsa; WTAS continued to serve the client until April 2009.  *Id.* ¶ 5.

[15]  At the request of one of its California clients, WTAS prepared income tax returns for the client's parents, who resided in Oklahoma City.  Dkt.94 Ex. 5 at 5. Although WTAS admits that it, in the process of preparing the individual tax returns for the Oklahoma residents, it contacted the residents by phone on approximately ten occasions, it nonetheless claims that it received "[m]ost, if not all, of the information necessary for the engagement [from its] client in California."  Dkt.94 Ex. 5 at 5.

[16]  WTAS has prepared non-resident tax returns for clients who are not Oklahoma residents but nonetheless have interests in or receive income from the state.  *See* Dkt.94 Ex. 5 at 4 (noting that WTAS occasionally prepares non-resident Oklahoma tax returns for clients who receive income from, conduct business in, or own property in that state); *id.* at 5 (indicating that WTAS has prepared Oklahoma sales tax or unclaimed property tax returns for three non-Oklahoma clients).  In each of those cases, however, WTAS was retained and paid by clients outside of Oklahoma, performed all of the relevant work outside of Oklahoma, and received the information necessary to prepare the Oklahoma returns from its clients, rather than by contacting individuals within the state.

[17]  WTAS claims that neither Mr. DeGirolamo nor any other WTAS employees were sent to Oklahoma in connection with the Kanbar account, Dkt.33 Ex.1 ¶ 13; Dkt.33 Ex. 2 ¶ 4, and it claims that all of the work pertaining to the Kanbar account was performed by employees in California, Dkt.94 Ex. 5 at 9-10.  *See* Dkt.33 Ex. 2 ¶ 3 (Affidavit of Mr. DeGirolamo) ("My

–11–

directed Mr. Kanbar's entire investment portfolio as far as governance and tax regulations were

concerned, Dkt.93 Ex. 6 ¶ 13, and discussed investment opportunities with Mr. Kaufman.[20]   It

also communicated with Mr. Kaufman[21] and other professionals in Tulsa on an  almost-daily

basis in order to discuss matters pertaining to the purchase of the Tulsa Properties.[22]  Even after

---

meetings concerning my work for Mr. Kanbar always occurred in San Francisco, California.");
*id.* ¶ 4 ("None of my work for Mr. Kanbar ever caused me to travel to Oklahoma.").  Mr.
Kaufman does not dispute this claim.

[18]   WTAS claims that this court should prohibit Mr. Kaufman from relying on
information contained in his affidavit, which was not previously disclosed, pursuant to Fed. R.
Civ. P. 37(b)(2)(A).  It also claims that Mr. Kaufman's affidavit lacks detail and is not based on
personal knowledge.  *See Argo v. BCBS of Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006)
(affirming the district court's decision to strike the portions of a statement that were made
without personal knowledge).  Absent additional briefing, this court cannot resolve the
arguments raised by WTAS.  Therefore, Mr. Kaufman's affidavit will be considered for the
limited purpose of resolving the motions presently before the court.

[19]   Because Mr. DeGirolamo is an employee of WTAS, his actions–including phone calls
and emails to individuals in Oklahoma–may be attributed to WTAS.  This court therefore
considers all of Mr. DeGirolamo's contacts with Oklahoma when determining whether WTAS
has established continuous and systematic contacts with the state.  In this section, references to
"WTAS" may refer to either Mr. DeGirolamo or WTAS agents in general.

[20]   For example, Mr. DeGirolamo allegedly provided advice and direction to Mr.
Kaufman regarding the investment of KSI funds into an oil and gas company with drilling
operations in Oklahoma in order to obtain favorable tax benefits.  Dkt.93 Ex. 6 ¶ 26.  Other
WTAS representatives also provided input regarding the tax implications of these investments.
*See* Dkt.94 Ex. 10 (email informing Mr. Kaufman that certain tax incentives would be
unavailable unless Mr. Kanbar was exposed to liability, and suggesting that Mr. Kaufman "may
want to review the ownership of NGAS with the operator to determine how the partnership
interest should be held" before any returns were prepared).

[21]   *See* Dkt.93 Ex. 6 ¶ 14 (stating that Mr. DeGirolamo and other WTAS employees
contacted Mr. Kaufman on three occasions to discuss the issue of cost segregation of the Tulsa
Properties); *id.* ¶ 15 (claiming that WTAS discussed depreciation policies with Mr. Kaufman on
more than ten occasions while Mr. Kaufman was in Tulsa).

[22]   For example, Mr. Kaufman claims that (1) Mr. DeGirolamo regularly negotiated with
attorneys at the Feldman Law Firm for the conveyance of the Tulsa Properties,  Dkt.93 Ex. 6 ¶ 8,

–12–

that transaction was complete, WTAS continued to provide tax-planning services to Mr. Kanbar and the entities associated with him.  *See* Dkt.94 Ex. 5 at 9.  In connection with that service, WTAS interacted with a number of professionals located in Tulsa, including lawyers at the Feldman Law Firm,[23] a Tulsa accountant,[24] and others.[25]  Mr. Kaufman concludes that these phone and email contacts with the state were so frequent and so numerous that Oklahoma may legitimately exercise general jurisdiction over WTAS.

Although these contacts are numerous, they are not the type of contacts that would give rise to general jurisdiction over WTAS.  It cannot be said that WTAS was "carrying on . . . a continuous and systematic, but limited, part of its general business" in the state of Oklahoma

---

and (2) Mr. DeGirolamo and other WTAS advisors "directed and instructed" that the title to the Tulsa Properties should be reassigned to a number of Oklahoma LLCs for tax purposes, *id.* ¶ 9.  Mr. Kaufman characterizes Mr. DeGirolamo and WTAS as the "sole decision makers" who "designed and controlled the formation of the . . . LLCs," *id.* ¶ 11, and directed and advised various professionals in Tulsa–including lawyers at the Feldman Law firm–regarding the details of the title reassignment, *id.* ¶ 10.  Mr. Kaufman claims that he and the other Oklahoma professionals advising Mr. Kanbar lacked the knowledge and experience to determine that a title change would be necessary.  *Id.* ¶ 12.

[23]  Dkt.94 Ex. 7 at 6 (indicating that WTAS employees requested and received documents from the Feldman Law Firm).

[24]  Specifically, WTAS representatives communicated with Don DeSelms, a Tulsa accountant who "furnish[ed] financial and tax information to WTAS and [Mr.] DeGirolamo." Dkt.94 Ex. 3 ¶¶ 1-2.  DeSelms was connected to the Tulsa Properties: At one point, he took responsibility for the creation and management of the financial statements of the LLCs that owned the Tulsa Properties.  *See* Dkt.94 Ex. 4.  In creating and managing those statements, he first obtained depreciation and amortization schedules from WTAS and Mr. DeGirolamo, then used information already in his possession to update the statements.  *Id.*

[25]  Mr. Kaufman points to WTAS's conversations with Rachel Warren, Mr. Kanbar's in-house counsel.  Although Warren did not reside in Tulsa, she did visit Tulsa on occasion, and Mr. Kaufman claims that WTAS employees communicated with her while she was in the Tulsa area.  Dkt.93 Ex. 6 ¶ 17.

when it made the aforementioned contacts.  *Helicopteros*, 466 U.S. at 415  (quoting *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 438 (1952)).  Instead, WTAS's phone calls, emails, and visits to individuals in Oklahoma were simply one part of the package of goods and services that WTAS provided to its clients.  *See id.* at 415-18 (distinguishing between activities related to a company's "general business," such as establishing a corporate office, holding company meetings and maintaining company files, and insignificant contacts related only to the "package of goods and services purchased," such as the petitioner's act of purchasing of eighty percent of its helicopter fleet from a Texas company and sending personnel into Texas for training).  Moreover, the phone calls and emails pertaining to the Tulsa Properties, though frequent, were not "continuous" but were limited in time and scope; WTAS's practice of making "daily" phone calls to Oklahoma began at the outset of Mr. Kanbar's investment in the Tulsa Properties, and ended when that engagement wound down.  Such frequent, but time-limited, phone and email communications with individuals in a state will not necessarily support a finding of general jurisdiction.  *See*, *e.g. Far West Capital, Inc.*, 46 F.3d at 1071 (holding that the defendants were not subject to jurisdiction in Utah, despite the fact that, over a six-month period, the plaintiffs exchanged phone calls with the Utah Plaintiff and sent faxes and drafts of the proposed lease to the plaintiff  in Utah). [26]  Although WTAS has, on some occasions, served Oklahoma clients,

---

[26]  *See also  Int'l Ins. Brokers, Ltd. v. Team Fin., Inc.*, No. 07-CV-0082-CVE-SAJ, 2007 WL 1959218, at *6 (N.D. Okla. June 29, 2007) (unpublished) (concluding that the court could not exercise general jurisdiction over defendants Mystic and Domaghue, who generated revenue through activity conducted in Oklahoma, visited the state and exchanged emails and over one hundred phone calls with individuals in the state during a two-month period, but who did not maintain offices, employees, agents, accounts, property or listings in the state); *Conley Corp. v. Indusa, Inc.*, No. 05-CV-0108-CVE-FHM, 2006 WL 266595, at *3 (N.D. Okla., Feb. 1, 2006) (determining that the plaintiff had failed to show that the defendant's contacts with Oklahoma were continuous and systematic, despite the fact that the defendant purchased the Oklahoma

filed papers in the state, and contacted Oklahoma professionals, these contacts were limited in time and purpose, and are insufficient to permit this court to exercise general jurisdiction over WTAS.[27]

Mr. Kaufman further claims that WTAS's maintenance of a website accessible from Oklahoma subjects WTAS to jurisdiction in this state.  Mr. Kaufman characterizes WTAS's website as an interactive, commercial website from which visitors may obtain information about becoming a WTAS client or employee.  This characterization must be rejected.  WTAS's website–which was reproduced for this court in an attachment to a response–appears to be a passive website on which WTAS has made information available to interested users.  *See* Dkt.95 Ex. 1 at 3 (instructing visitors to contact the nearest WTAS office to learn more about becoming a WTAS client).  Mr. Kaufman has not established that the website does anything more than "make information available to those who are interested in it."  *Soma Med. Int'l*, 196 F.3d at 1296 (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp 1119, 1123-24 (W.D. Pa. 1997).  Absent any showing that WTAS has "actually and deliberately used its website to

_____

plaintiff's product for resale in Puerto Rico, kept in regular contact with plaintiff through telephone calls and electronic mail in order to facilitate sales, placed orders with plaintiff, sent payments to plaintiff in Oklahoma, and sent personnel to Oklahoma for training).

[27]  *See Soma Medical Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1296 (10th Cir. 1999) (holding that the defendant's activities in the state–which included filing UCC financing statements, recording several instruments, and filing civil cases–were not sufficient to subject the defendant to general jurisdiction); *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir. 1996) (concluding that defendant Machol, a Colorado law firm, was not subject to general jurisdiction in Michigan even though Machol had represented Michigan residents on more than one hundred matters during the relevant time period); *id.* at 1543-44 (holding that Colorado did not have general jurisdiction over defendant Watt, despite the fact that Watt had a bank account in the state, traveled to the state several times a year, and conducted "a relatively small amount of business in the state").

conduct commercial transactions on a sustained basis with a substantial number of residents of the forum," *Smith v. Basin Park Hotel, Inc*, 178 F. Supp. 2d 1225, 1235 (N.D. Okla. 2001),[28] or has otherwise conducted activity through its website, *see Soma Med. Int'l*, 196 F.3d at 1296-97, this court must conclude that WTAS's maintenance of a website accessible to Oklahomans is not a basis for subjecting WTAS to personal jurisdiction in this state.

      2.    <u>General Jurisdiction over Mr. DeGirolamo</u>

      Mr. DeGirolamo's contacts with Oklahoma are even less frequent than WTAS's contacts. *See supra* n.19.   Like WTAS, Mr. DeGirolamo did have contact with individuals in Oklahoma during the time period surrounding the purchase of the Tulsa Properties.  Unlike WTAS, however, Mr. DeGirolamo has not provided services to clients located in Oklahoma, nor has he filed Oklahoma returns on his clients' behalf.  In fact, it is undisputed that Mr. DeGirolamo has never traveled to Oklahoma and has never provided services to anyone residing in Oklahoma. Dkt.32 Ex. 1 ¶¶ 4, 7.  Thus, Mr. DeGirolamo's contact with the state is limited to his participation in numerous phone and email conversations with Tulsa professionals during the time period surrounding the acquisition of the Tulsa Properties.  Such contacts are, for the reasons already stated, insufficient to permit this court to exercise general jurisdiction over Mr. DeGirolamo.  *See Int'l Ins. Brokers, Ltd. v. Team Fin., Inc.*, No. 07-CV-0082-CVE-SAJ, 2007 WL 1959218, at *6 (N.D. Okla. June 29, 2007) (unpublished) (concluding that the court could not exercise general jurisdiction over the defendants, who generated revenue through activity

---

[28]  In that case, this court concluded that the defendant was not subject to general personal jurisdiction based on its website, which offered information about the defendant's services, solicited business, and allowed users to make on-line reservation requests. *Smith v. Basin Park Hotel, Inc*, 178 F. Supp. 2d 1225, 1235 (N.D. Okla. 2001).

conducted in Oklahoma, visited the state and exchanged emails and over one hundred phone calls with individuals in the state during a two-month period, but who did not maintain offices, employees, agents, accounts, property or listings in the state).

3.      Specific Jurisdiction over WTAS and Mr. DeGirolamo

Having determined that neither WTAS nor Mr. DeGirolamo are subject to general jurisdiction in Oklahoma, this court must consider whether Oklahoma may exercise specific jurisdiction over those defendants.  The specific-jurisdiction inquiry has two components: First, the court must determine "whether the defendant has such minimum contacts with the forum state 'that he should reasonably anticipate being haled into court there.'" *OMI Holdings, Inc.*, 149 F.3d at 1091 (quoting *World-Wide Volkswagen*, 444 U.S. at 297).  Second, the court must evaluate whether the exercise of jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice."  *Id.* (quoting *Asahi Metal Indus. Co.*, 480 U.S. at 113).

When determining whether a defendant has established minimum contacts with a state, courts consider whether the defendant "purposefully directed its activities at residents of the forum," and "whether the plaintiff's claim arises out of or results from 'actions by the defendant *himself* that create a substantial connection with the forum state.'" *Id.* at 1091 (quoting *Asahi Metal Indus. Co.*, 480 U.S. at 109).  Where, as here, the conduct complained of consists of an intentional tort, the "purposeful direction" element requires both that the defendants "foresaw (or knew) that the effects of their conduct would be felt in the forum state [and] that [the] defendants undertook intentional actions that were expressly aimed at that forum state."  *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1077 (10th Cir. 2008) (emphasis removed).  In

addition to reflecting purposeful availment or direction, "the cause of action must arise out of [the defendant's] contacts" with the state. *Kuenzle*, 102 F.3d at 456.  Accordingly, when evaluating the Defendants' contacts with the forum, we look only to those contacts that are related to the plaintiff's claim, and we ignore those contacts that are unrelated to the conduct underlying the lawsuit. *See Soma Med. Int'l.*, 196 F.3d at 1298.

In this case, Mr. Kaufman alleges that the Defendants planned and carried out an elaborate scheme designed to defame and harm him in the state of Oklahoma.  Although the Defendants were located in California, Mr. Kaufman claims that they made a number of contacts with the state of Oklahoma in order to accomplish their goals.  Namely, Mr. Kaufman claims that, while he was residing in Oklahoma, representatives of HSBC Bank called him and told him that he must provide replacement collateral for certain KSI accounts.  HSBC continued to discuss the matter with Mr. Kaufman on an almost-daily basis.  As a result of these discussions, Mr. Kaufman substituted the collateral from Oklahoma.  Later, after it was determined that the substitution violated IRS self-dealing regulations, Mr. DeGirolamo contacted Mr. Kaufman in Oklahoma and informed him of the problem.  Mr. DeGirolamo also contacted Mr. Kanbar in California, informed him of the situation, and blamed Mr. Kaufman for the violation.  Mr. DeGirolamo advised an attorney on an affidavit–later sent to and signed by Mr. Kaufman in Oklahoma–in which Mr. Kaufman accepted blame for the violation.  As a result of the Defendants' activities, Mr. Kanbar testified that Mr. Kaufman had lied to him and deceived him,

Dkt.93 Ex. 6 ¶ 29, and defamatory statements about Mr. Kaufman were made in the state of Oklahoma.[29]

This court cannot conclude, based on these activities, that WTAS and Mr. DeGirolamo "purposefully directed" their actions at Oklahoma. *Dudnikov*, 514 F.3d at 1071  (citation omitted).  Indeed, it appears that the Defendants' conduct was, in fact, aimed at the state of California: The alleged conspiracy originated in the state of California, where Mr. DeGirolamo works and WTAS maintains an office; the scheme was allegedly designed to remove Mr. Kaufman from his position as Maurice Kanbar's financial advisor–a position that Mr. Kaufman received while residing in the state of California after moving there at Mr. Kanbar's request, Dkt.2 Ex. B ¶¶ 14-18–so that WTAS and Mr. DeGirolamo could receive a financial benefit from Mr. Kanbar, a California businessman.  The geographic focal point of the Defendants' conduct was California, not Oklahoma.  *Cf. Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (holding that the defendants were subject to jurisdiction in California where the defendants published an article drawn from California sources about the California activities of a California resident, and widely circulated the publication in that state); *Dudnikov*, 514 F.3d at 1072-73 (concluding that the defendants were subject to jurisdiction in Colorado because their actions were intended to

---

[29]  Mr. Kaufman points to no defamatory statements made by the Defendants themselves. Although Mr. Kaufman stated in his affidavit that Mr. DeGirolamo made defamatory statements about him in the state of Oklahoma, he has not provided any details pertaining to the timing, audience or content of those statements.  Mr. Kaufman's conclusory assertion that, at some point, Mr. DeGirolamo said something to someone cannot support a finding of jurisdiction. *See Ten Mile Indus. Park.*, 810 F.2d at 1524 (noting that, although the court must accept as true the allegations set forth in the complaint, only the "well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true").   Although Maurice Kanbar–who is not a party to this action–allegedly made defamatory statements about Mr. Kaufman, *see* Dkt.93 Ex. 6 ¶ 29, those statements may not be attributed to Mr. DeGirolamo or WTAS.

prevent the plaintiff, a Colorado company, from holding an online auction).  Although some contacts were made with the state of Oklahoma when the Defendants' alleged scheme was carried out, those contacts–to the extent they may be charged to Mr. DeGiorlamo and WTAS[30]–are merely fortuitous.  None of the alleged torts had any connection to Oklahoma beyond Mr. Kaufman's domicile–a domicile he chose some time after the relationships underlying this dispute had formed.  *See Far West Capital, Inc.*, 46 F.3d at 1080 (concluding that, although the defendants made demands upon and sent a threatening letter to the Utah plaintiff, the focal point of the parties' relationship was Nevada, not Utah, and Utah's role in the dispute was merely fortuitous, as it had no connection to the alleged torts beyond the plaintiff's domicile).

Nor can it be said that the Defendants reasonably foresaw that the effects of their conduct would be felt in Oklahoma.  Even if the Defendants could have foreseen that, based on their conduct, Mr. Kanbar would remove Mr. Kaufman from his post and make defamatory statements about him, the Defendants could not have know that the brunt of this injury would be borne by Mr. Kaufman in the state of Oklahoma.  Mr. Kaufman is a self-described retired New York

---

[30]  Most of the phone calls that allegedly furthered the conspiracy–specifically, those pertaining to the need to replace the collateral in certain KSI accounts–were made by HSBC Bank, not Mr. DeGirolamo or WTAS.  Similarly, although Mr. Kaufman has alleged that Mr. DeGirolamo assisted in drafting the affidavit he signed, it is not clear that Mr. DeGirolamo or WTAS actually sent either that affidavit or the letter of resignation to Mr. Kaufman.  It appears, therefore, that Mr. Kaufman is asking this court to assert specific jurisdiction over non-resident defendants based on the actions of their coconspirators and colleagues.  This court has declined to exercise jurisdiction on this basis in the past, and will not do so now.  *See Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1097 (N.D. Okla. 2003) (concluding that the plaintiffs' conclusory allegations that defendants SCMSI and Capital Equity were part of an enterprise that caused harm to the plaintiffs could not support a finding of jurisdiction, as the plaintiffs had not pointed to any actions that those two defendants themselves had directed at the state).

resident who had worked for more than thirty years in that state before moving to California at Mr. Kanbar's request.  After agreeing to become Mr. Kanbar's financial advisor, he moved to Tulsa, Oklahoma in order to act as Mr. Kanbar's agent in the acquisition and management of the Tulsa Properties.  Dkt.93 Ex. 6 ¶ 3.  It was not clear to the Defendants that this relocation was permanent.  Dkt.32 Ex. 1 ¶ 3 (noting that Mr. DeGirolamo understood Mr. Kaufman to be a resident of San Francisco, California).  In fact, even after the events giving rise to this action took place, Mr. Kaufman described himself as a New York citizen.  Dkt.100 Ex. A ¶ 1 (2007 affidavit of Henry Kaufman) ("I am a citizen of New York who resides, at times, in Oklahoma.").  Thus, although WTAS and Mr. DeGirolamo certainly knew that Mr. Kaufman was in Oklahoma during the time these events took place, this court cannot conclude that they knew Mr. Kaufman resided and would be harmed by their actions in this state.  *Cf. Calder*, 465 U.S. at 788-89 (noting that the California plaintiff's "television career *was centered in* California," and the  brunt of the harm would be felt in that state (emphasis added)).

In sum, the conspiracy Mr. Kaufman complains of involved California entities who served a California businessman and sought to interfere with a business relationship established in the state of California.  Their actions were aimed at the state of California; they did not direct their actions at the state of Oklahoma, and they did not know, and could not foresee, that the effects of their conduct would be felt there.  This court concludes that neither Mr. DeGirolamo nor WTAS has established minimum contacts with the state of Oklahoma.  Therefore, this court lacks specific jurisdiction over these two defendants. [31]

---

[31]  Because WTAS and Mr. DeGirolamo have not established minimum contacts with the forum state, this court need not address the question of whether the exercise of jurisdiction over the Defendants would comport with fair play and substantial justice.  *Int'l Ins. Brokers, Ltd.*,

### III.  Conclusion

Mr. Kaufman has failed to demonstrate that HSBC USA has any contacts with the state of Oklahoma.  Furthermore, he has not shown sufficient contacts between the remaining defendants and the state of Oklahoma to allow this court to exercise personal jurisdiction over them.  Accordingly, this court grants the Defendants' motions to dismiss.  **Dkts. 29, 32, 33.**  Mr. Kaufman may, within the next fourteen (14) days, seek to substitute an appropriate HSBC entity for HSBC USA.  If Mr. Kaufman fails to make such a substitution, this court will dismiss this case without prejudice.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

---

2007 WL 1959218, at *7.